**Gary Eldon ALVORD, a/k/a Paul Robert Brock, a/k/a Gary Eldon Venczel, Petitioner-Appellee, Cross-Appellant,**

v.

**Louie L. WAINWRIGHT, Secretary, Department of Corrections, Respondent-Appellant, Cross-Appellee.**

No. 83-3345.

United States Court of Appeals,
Eleventh Circuit.

Feb. 10, 1984.

Rehearing and Rehearing En Banc
Denied April 25, 1984.

Ann Garrison Paschall, Asst. Atty. Gen., Tampa, Fla., for Wainwright.

William J. Sheppard, Elizabeth L. White, Steven Malone, Courtney Johnson, Jacksonville, Fla., for Alvord.

Before HILL and FAY, Circuit Judges, and ALLGOOD *, District Judge.

JAMES C. HILL, Circuit Judge:

Louie L. Wainwright, Secretary of the Florida Department of Corrections, appeals to this court from the order of the district court holding invalid Gary Eldon Alvord's sentence of death and granting Alvord the writ of habeas corpus subject to the state's holding a new sentencing hearing. Alvord cross-appeals from the district court's denial of the writ on the other grounds raised in his petition. The Supreme Court's recent decision in *Wainwright v. Goode,* —— U.S. ——, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983),

mandates reversal of the portion of the district court's order granting the writ; we affirm the district court on all other grounds.

In 1974, Alvord was indicted, tried, convicted, and sentenced to death in Hillsborough County, Florida on three counts of murder in the first degree. The Florida Supreme Court affirmed Alvord's convictions and sentence, *see Alvord v. State,* 322 So.2d 533 (Fla.1975), and the United States Supreme Court denied certiorari, *see Alvord v. Florida,* 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976). Alvord then filed a motion for reduction of sentence under Florida Rule of Criminal Procedure 3.800(b); the state court denied the motion, and the Florida Supreme Court refused a petition for a writ of mandamus in 1977. In 1978, Alvord filed a motion for post-conviction relief under Florida Rule of Criminal Procedure 3.850; the state court denied the motion, and the Florida Supreme Court affirmed. *See Alvord v. State,* 396 So.2d 184 (Fla.1981). Alvord filed this case in federal district court in 1981. The district court, 564 F.Supp. 459, granted the above-described partial relief, and both parties appealed.

## I. RELIANCE ON NONSTATUTORY AGGRAVATING CIRCUMSTANCE

At Alvord's trial, the sentencing judge, after finding four statutory aggravating factors to be present, concluded his order imposing the death penalty by stating that Alvord "has been and [will] continue to be a danger and a menace to society and therefore must pay the ultimate penalty, death by electrocution, as provided by the laws of the State of Florida." The district court concluded that this statement demonstrates that the sentencing judge relied on a nonstatutory aggravating circumstance, *see Miller v. State,* 373 So.2d 882 (Fla.1979) (future dangerousness not a statutory aggravating factor); and, as dictated by our opinion in *Goode v. Wainwright,* 704 F.2d

* Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation.

593, 612 (11th Cir.1983), held Alvord's death sentence constitutionally invalid. The Supreme Court recently reversed *Goode, see Wainwright v. Goode,* —— U.S. ——, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983), and the state contends that the Supreme Court's decision requires us to reverse the district court. Alvord argues that constitutionally-based distinctions require a different result in this case than the result reached by the Supreme Court in both *Wainwright v. Goode* and *Barclay v. Florida,* —— U.S. ——, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983).[1]

This case is the latest of several cases, including *Goode,* in which this court has addressed this issue. *See, e.g., Proffitt v. Wainwright,* 685 F.2d 1227, 1266–69 (11th Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983); *Stephens v. Zant,* 631 F.2d 397 (5th Cir.1980), *modified,* 648 F.2d 446 (5th Cir.1980), *rev'd and remanded,* —— U.S. ——, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), *on remand,* 716 F.2d 276 (5th Cir.1983); *Henry v. Wainwright,* 661 F.2d 56 (5th Cir. Unit B 1981) (*Henry I*), *vacated and remanded,* 457 U.S. 1114, 102 S.Ct. 2922, 73 L.Ed.2d 1326 (1982), *judgment reinstated,* 686 F.2d 311 (5th Cir. Unit B 1982) (*Henry II*), *vacated and remanded,* —— U.S. ——, 103 S.Ct. 3566, 77 L.Ed.2d 1407 (1983), *prior judgment reversed,* 721 F.2d 990 (5th Cir. Unit B 1983) (*Henry III*). A review of these cases and of the Supreme Court's decision in *Barclay v. Florida,* —— U.S. ——, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), leads us to the conclusion that any reliance by the trial judge on Alvord's propensity to commit violent crimes in the

future does not constitute constitutional error.

Alvord's first argument (raised in his brief before the Supreme Court decided *Goode* ) is that *Proffitt* requires this court to invalidate his sentence.[2] *Proffitt,* 685 F.2d at 1266–69, would seem to mandate such a result. The Supreme Court's decisions in *Goode* and *Barclay,* however, invalidate the reasoning relevant to our decision in this case set forth in that opinion.[3] In *Goode,* the Supreme Court gave three alternative reasons for its reversal of our decision. First, stated the Court, if reliance on a nonstatutory factor presents a question of law, we should not have displaced the Florida Supreme Court's resolution of an issue of state law. —— U.S. at —— ——, 104 S.Ct. at 382. Second, if the reliance presents an issue of fact, we failed adequately to defer to a state finding of fact under 28 U.S.C. § 2254(d) (1976). *Id.* at ——, 104 S.Ct. at 382. Third, even if the sentencing judge relied on a factor "unavailable to him under state law," this reliance, given the review by the Florida Supreme Court, did not render Goode's sentencing unconstitutional. *Id.* The Court noted that there "is no claim that in conducting its independent reweighing of the aggravating and mitigating circumstances the Florida Supreme Court considered Goode's future dangerousness." *Id.*

We see no possible distinctions indicating that *Proffitt,* not *Goode,* would control this case. The existence of mitigating circumstances no longer is of importance. We

---

**1.** The state argues on appeal only that *Barclay* and *Goode* allow the sentencing judge to rely on the nonstatutory factor in this case and does not contend that the failure of the trial judge affirmatively to find future dangerousness as an aggravating factor when listing the four (other) aggravating factors indicates that the trial judge did not rely on future dangerousness as a factor. We will assume for purposes of this opinion that the state judge relied on future dangerousness as a separate and distinct factor.

**2.** We realize that the Supreme Court denied certiorari in *Proffitt, see* —— U.S. ——, 104 S.Ct. 508, 78 L.Ed.2d 697; however, the denial

of certiorari has no precedential effect. In *Proffitt,* we found other constitutional inadequacies in the sentencing hearing. *See* 685 F.2d at 1251–1265 (confrontation clause violation; *Godfrey v. Georgia* invalid statutory aggravating factor). The Court's decision in *Goode* obviously does not invalidate our holding in *Proffitt* as to the effect of the confrontation clause.

**3.** Alvord dropped at oral argument (held after the *Goode* decision) the contention that *Proffitt* controls here and asserted that this case is distinguishable from *Goode* for the reasons discussed below.

relied on their existence in *Goode* and concluded that it was not a case, as was *Barclay* or *Ford v. Strickland,* 696 F.2d 804, 815, 820 (11th Cir.1983) (en banc), in which the Florida "harmless error" rule applied. In both *Barclay* and *Ford,* no mitigating circumstances were found; however, in *Goode,* as in this case, substantial mitigating factors (here, inability to conform to the requirements of the law and extreme mental disturbance) were present. The Supreme Court invalidated that distinction.[4]

In the final analysis, the Supreme Court in *Goode* held that if the state supreme court approves a conviction and death sentence despite reliance on evidence of, or findings of, nonstatutory circumstances, a federal habeas court cannot grant relief unless the evidence or factor in question was constitutionally inappropriate. *See also Zant v. Stephens,* 103 S.Ct. at 2748–49; *Barclay,* 103 S.Ct. at 3434–35 (Stevens, J., concurring). There is no basis for finding unconstitutional the nonstatutory factor at issue here; indeed, the factor—future dangerousness—is the same factor relied on in *Goode.* And we find no distinction between the review and approval of the death sentence by the Florida Court in this case and the review and approval in *Goode.* *Compare Alvord v. State,* 322 So.2d 533 (Fla. 1975) *with Goode v. State,* 365 So.2d 381 (Fla.1978). Although the Florida Court approved the death sentence in *Alvord* without mention of the trial judge's reliance on the nonstatutory factor, the same was true in *Goode,* and the Supreme Court approved that procedure.[5]

*Henry III* and our above analysis of the *Goode* decision invalidate the remaining distinctions raised by Alvord at oral argument. He contends that the evidence of dangerousness in this case was not properly admissible and that the failure of the Florida Court to follow its statutes violates the due process clause. In *Goode,* the Court invalidates the latter argument: in both this case and in *Goode* the Florida Court followed exactly the same procedure. As to the former argument, both *Goode* and *Henry III,* 721 F.2d at 994, indicate that admissibility of evidence, absent constitutional infirmity, is a question of state law. The evidence here was relevant to Alvord's character, which is a proper subject of inquiry at a sentencing hearing. *See, e.g., Barclay,* 103 S.Ct. at 3434–35 (Stevens, J., concurring). Finding no distinctions of significance between this case and *Goode,* we reverse the order of the district court granting the writ because of the trial judge's reliance on the nonstatutory factor.

## II. EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL

On cross-appeal, Alvord first argues that the district court erred in deciding that he received effective assistance of counsel at trial and that his counsel's assistance at his sentencing hearing, although ineffective, did not prejudice him. He contends that his trial counsel, Mr. Meyers, failed adequately to investigate the possibility of an insanity defense at trial and committed a clearly prejudicial mistake in failing to raise such a defense. He also contends that Meyers failed to unearth and present evi-

---

4. The Supreme Court indicated in *Zant v. Stephens,* —— U.S. ——, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), that although the presence of mitigating circumstances might be constitutionally significant, the issue was not before them in that case. The Court stated:

Finally, we note that in deciding this case we do not express any opinion concerning the possible significance of a holding that a particular aggravating circumstance is "invalid" under a statutory scheme in which the judge or jury is specifically instructed to weigh statutory aggravating and mitigating circumstances in exercising its discretion whether to impose the death penalty.

*Id.* 103 S.Ct. at 2750. In *Barclay,* the Court noted that no mitigating factors were found by the judge, although some existed. 103 S.Ct. at 3435–36 (Stevens, J., concurring). In *Goode,* the Court thus extended its holding in *Barclay* to cover cases in which the trial judge finds mitigating factors to exist.

5. As we noted in *Henry III,* 721 F.2d at 994–995, the failure of the Florida Supreme Court affirmatively to pass on an issue apparently does not lessen the deference required by *Barclay* and, now, by *Goode.*

dence at the sentencing hearing demonstrating his lack of ability to conform his conduct to the requirements of the law. We conclude that the district court properly resolved both issues against Alvord.[6]

The record demonstrates that Alvord has a long history of mental illness. He first entered a mental hospital at age thirteen. In 1967, he was charged with the rape and murder of a ten year old girl in Michigan; after spending two years in an institution, he was declared competent to stand trial on the charge but was found not guilty by reason of insanity. Alvord committed the three murders for which he received the death sentence after escaping from the Ionia State Hospital in Michigan.

Meyers was appointed counsel for Alvord shortly after Alvord was indicted in 1973. Alvord refused to talk with Meyers; however, Meyers learned from the prosecutor that Alvord had been adjudicated not guilty by reason of insanity in Michigan. Meyers therefore moved for a mental examination of Alvord, and the trial judge directed two court-appointed psychiatrists, Drs. Sprehe and Gonzales, to conduct the examination. Alvord refused to talk with the psychiatrists without his attorney present, and the psychiatrists could give no opinion as to Alvord's mental state. The trial judge therefore committed Alvord to a state hospital for observation. The judge later rescinded this order, however, because he doubted his authority to issue it,[7] and the state instead invited Dr. Robey, a psychiatrist who had worked with Alvord in Michigan, to come and conduct an examination.[8]

Alvord talked with Dr. Robey, and Robey testified at a pretrial hearing held by the court that Alvord was competent to stand trial. *See infra* § IV (setting forth Robey's testimony). Robey again examined Alvord after the hearing and concluded that Alvord was both competent to stand trial and sane at the time he committed the offense. (Apparently the illness suffered by Alvord is a type that can suddenly recur or go into long remissions.) The court ordered that Sprehe and Gonzales again attempt to examine Alvord; at another competency hearing, Sprehe testified that Alvord was competent to stand trial, but qualified his opinion because Alvord was still uncooperative. Gonzales, because of Alvord's lack of cooperation, could form no opinion. Relying on the testimony of Robey and Sprehe, the court ruled Alvord competent to stand trial.[9]

6. The district court held an evidentiary hearing on this claim; Alvord does not challenge the adequacy of the hearing.

7. Meyers did not learn until several weeks had passed that Alvord had not been committed; he then moved several times to have Alvord recommitted.

8. Alvord contends that the trial judge issued these orders on his own motion or at the suggestion of the prosecutor. From examining the record, however, we conclude that Meyers made numerous motions; for example, the state contended at a speedy trial hearing that delays in the trial were caused by Meyers' numerous motions to have Alvord examined or committed or both. Meyers and the trial judge clearly accepted these statements by the prosecutor as true. Thus, Alvord's present contention that Meyers virtually ignored him before the trial is contradicted by these portions of the record.

9. Alvord asserts that the trial court's reliance on Robey's testimony was improper. Although we will more fully address this contention in a later section of our opinion, *see infra* § IV, we

pause now to note the unique role played by Dr. Robey in these proceedings. The trial judge made every effort to ensure that Alvord received a fair and adequate examination. Both Alvord's attorney and the prosecutor wanted a mental examination of Alvord to be conducted; however, Alvord repeatedly refused to talk to the court-appointed psychiatrist. Therefore, at state expense, the trial judge requested Dr. Robey to fly in from Michigan to examine Alvord. Robey had been primarily responsible for Alvord's treatment while he was a patient in Michigan; and, as Robey testified at trial, he knew Alvord better than any other doctor. *See infra* § IV (quoting from transcript).

Robey's knowledge of Alvord's history and illness placed him in a uniquely qualified position to perform the needed examination. Furthermore, he was a psychiatrist with whom Alvord was willing to talk and by whom Alvord would consent to be examined. The trial judge could well have concluded that if one of the numerous psychiatrists in Florida could not examine Alvord, calling in a psychiatrist from Michigan would be a waste of resources. He did not so conclude, and we commend the judge for re-

Nevertheless, a few weeks before trial, the court ordered Sprehe and Gonzales again to examine Alvord. Sprehe again testified, after the examination, that Alvord was competent; Gonzales again could not form an opinion. Neither doctor could testify as to Alvord's sanity at the time of the offense. Although Meyers asserted that the Michigan conviction constituted prima facie evidence of incompetency, the trial judge, noting that Meyers had produced no documentary evidence of that judgment, again pronounced Alvord competent to stand trial. Before trial, Meyers moved unsuccessfully for Alvord to be committed for observation and filed a notice of intent to plead insanity, attaching a copy of Alvord's previous acquittal on the basis of insanity, which is now inexplicably absent from the state trial record.[10]

### A. Meyers' Assistance at the Guilt-Innocence Phase.

Meyers conducted no independent investigation into Alvord's history of mental illness. He did not contact doctors, other than Robey, at the Michigan hospital at which Alvord spent a considerable amount of time, nor did he obtain any except a small portion of Alvord's medical record. He did not raise at trial the presumption of insanity afforded Alvord under Florida law by reason of his prior adjudication of insanity, the effect of which is to place the burden on the prosecution to prove sanity beyond a reasonable doubt. See Parkin v. State, 238 So.2d 817 (Fla.1970); Livingston v. State, 383 So.2d 947 (Fla.App.1980); Hixon v. State, 165 So.2d 436 (Fla.App.1964). Alvord contends that these actions and inactions constitute ineffective assistance.

In response to Alvord's contentions, the state argues that Meyers properly failed to investigate the possibility of raising the insanity defense because Alvord refused to allow that defense and properly failed to raise the defense because Alvord insisted on

relying on an admittedly weak, unsupported alibi.[11] Meyers testified at the evidentiary hearing that Alvord's lack of cooperation caused him to abandon the insanity defense; given Robey's opinion that Alvord was sane at the time of the offense, Meyers did not think it would be successful without Alvord's cooperation.

The question we must decide is whether, under the circumstances, Meyers' decisions and actions constituted reasonably effective assistance. See Washington v. Strickland, 693 F.2d 1243 (5th Cir. Unit B 1982) (en banc), cert. granted, —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983). It is now axiomatic that the petitioner must prove his counsel ineffective by a preponderance of the evidence. Id. at 1250. It is also axiomatic that counsel has a duty to conduct a reasonable investigation under the circumstances. Id. at 1251–58. The issue presented in this case, however, is slightly different than the issue in Washington v. Strickland and in many other cases: here, the defendant, Alvord, did not want and affirmatively sought to prevent his trial attorney from asserting the insanity defense that he now claims his attorney, as a matter of constitutional law, should have raised. Thus, this is not the same case as several cited by Alvord in which the defendant was willing to assert the defense but his attorney's inadequacy prevented him from doing so successfully. See Beavers v. Balkcom, 636 F.2d 114 (5th Cir. Unit B 1981); Davis v. Alabama, 596 F.2d 1214 (5th Cir.1979), vacated as moot, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980); United States v. Fessel, 531 F.2d 1275 (5th Cir.1976).

We conclude that in this case the assistance rendered by Meyers met the requirements of the Constitution. See, e.g., Washington v. Watkins, 655 F.2d 1346, 1356 (5th Cir.1981) ("effectiveness may not be as-

---

sponding to the problems presented by Alvord's refusal to talk to court-appointed doctors by adopting the logical solution of obtaining, at obvious expense, the doctor most qualified to render an opinion.

10. The district court found (as an historical fact) that Meyers filed this notice, and it has now been added to our record on appeal.

11. The evidence produced at trial of Alvord's guilt was overwhelming.

sessed through the finely ground lenses of 20/20 hindsight"). Here, the state provided three psychiatrists to interview Alvord, and he would only communicate with Robey. Robey, who indicated that he was more familiar with Alvord than any other psychiatrist, testified that Alvord was both sane and competent to stand trial. *See infra* § IV (setting forth testimony from transcript). After repeated and conscientious attempts to have doctors communicate better with Alvord, the trial judge ruled Alvord competent. Meyers repeatedly advised Alvord to assert the insanity defense, but Alvord refused to do so. Meyers therefore did not assert the defense but argued that Alvord's incapacity weighed against imposition of the death penalty.

In light of Alvord's refusal to assert the insanity defense, although earnestly counseled by his defense attorney to do so, we conclude that Meyers rendered competent assistance. Further research into Alvord's background would have been fruitless because Alvord would not allow Meyers to produce evidence of insanity. The trial judge held Alvord competent—on the unrebutted advice of two psychiatrists—and the only psychiatrist able to form an opinion would have testified that Alvord was sane. In addition, given Alvord's competency, Meyers was ethically bound to follow his client's wishes. *See Foster v. Strickland,* 707 F.2d 1339, 1343 (11th Cir.1983). In *Foster,* the attorney wanted to present a second-degree murder defense based on a depraved-mind theory; the defendant refused to allow that defense, and this court held that the decision of the attorney to follow his client's wishes did not constitute ineffective assistance. *Id.*

We realize that there may be cases in which the client's faculties are so impaired that the client cannot choose for himself what to do. Alvord argues that this is the problem here and cites *Brennan v. Blankenship,* 472 F.Supp. 149, 156 (W.D.Va.1979),

*aff'd mem.,* 624 F.2d 1093 (4th Cir.1980); however, we need not comment on the resolution of that case by our sister circuit nor do we need to speculate here on what facts might lead us to conclude that the attorney should ignore his client and pursue some other unspecified course of action. Hopefully, if the client cannot adequately help prepare his defense, the trial judge will rule him incompetent to stand trial. Here both psychiatrists testified to Alvord's competency, and Meyers made a reasonable effort to convince the judge to rule Alvord incompetent.[12] Given this determination, Meyers adopted a reasonable course of action under the circumstances.

### B. *Effective Assistance at the Sentencing Hearing.*

Alvord contends that Meyers failed to provide effective assistance at his sentencing hearing because he failed to collect and present as mitigating evidence Alvord's extensive history of mental illness; failed effectively to cross-examine Robey, who testified for the state, because of Meyers' unfamiliarity with Alvord's background; failed to produce other psychiatrists as "rebuttal witnesses"; and failed to produce witnesses to testify favorably regarding Alvord's character. The record demonstrates that Meyers called no witnesses at the sentencing hearing; however, Meyers testified before the district court that, had the state not called Robey, he would have called him because Robey would testify to the existence of the two mitigating circumstances found by the jury and judge. The district court stated that it was "prepared to conclude that" Meyers rendered ineffective assistance because of his failure adequately to investigate Alvord's background; however, the court denied the writ on this issue because it found that Alvord suffered no prejudice. We also conclude that Alvord suffered no prejudice; we therefore need not decide whether Meyers' assistance was inef-

---

12. We have read the record of all the pretrial proceedings in this case. We are convinced that Meyers rendered effective assistance: he argued for Alvord's commitment; he moved for a declaration of incompetency; he cross-examined the expert witnesses. Meyers cannot be faulted simply because he did not succeed.

fective.[13] *See Washington,* 693 F.2d at 1264 n. 33 (no need to address ineffectiveness if no prejudice).

■ At the sentencing hearing, Robey testified to the existence of the two mitigating circumstances found in this case. He stated that Alvord had been previously adjudicated insane and asserted strongly that Alvord's mental illness was not of the type that Alvord could not be rehabilitated. The state called Robey, so Alvord cannot blame Meyers for any testimony by Robey that he now considers damaging.[14] As the district judge noted, Alvord offered at neither the state nor the federal habeas evidentiary hearings evidence that Meyers could have produced had he conducted an investigation and called other witnesses; he also did not explain how Meyers could more effectively have cross-examined Robey. Alvord has called our attention to no evidence that Meyers should have produced at the sentencing hearing but did not; Alvord has not, therefore, carried his burden of establishing prejudice.[15]

Alvord contends that he deserves a new sentencing hearing despite our conclusion that he has not been prejudiced because in this case the "ineffectiveness of counsel is so pervasive that a particularized inquiry into prejudice would be 'unguided specula-

tion.' " *Washington,* 693 F.2d at 1259 n. 26 (quoting *United States v. Porterfield,* 624 F.2d 122, 125 (10th Cir.1980)). We are mindful that actual prejudice need not be demonstrated in some cases. *See Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (state improperly requires single attorney to represent multiple defendants at same trial); *Adams v. Balkcom,* 688 F.2d 734, 739 n. 1 (11th Cir.1982) (representation "functionally equivalent in every respect to having no representation at all"). We recognized in *Washington v. Strickland* that prejudice need not always be demonstrated, 693 F.2d at 1259; however, *Washington* clearly implies that prejudice must be shown in this case. In both this case and *Washington,* the alleged inadequacy stems from a failure adequately to investigate, and we required the petitioners to show prejudice in *Washington.* We sit as a habeas corpus tribunal to grant relief to persons *harmed* because their *constitutional rights* have been violated. In some cases, we will infer harm because, although it is difficult or impossible to prove, the circumstances of the petitioner's conviction are inherently prejudicial. In some cases, the harm is so obvious it would be a waste of resources to prove it. This case presents neither situation; the district court correct-

---

**13.** Alvord raises one other claim: he contends that Meyers' closing argument was constitutionally ineffective under *King v. Strickland,* 714 F.2d 1481 (11th Cir.1983). Meyers' closing argument in this case does not remotely resemble the argument in *King.* In *King,* the counsel "separated himself from his client" and "may have done more harm than good." *Id.* at 1491. Meyers, however, made a lengthy argument describing the horrible circumstances of an execution and Alvord's inability to conform his conduct to society's dictates; he also noted that the judge could put Alvord in jail for life, thus rebutting any argument that Alvord could kill again. Given the overwhelming proof of Alvord's guilt, Meyers clearly rendered constitutionally effective assistance.

**14.** Alvord contends that parts of Robey's testimony were not admissible. Alvord's contention, which we have rejected above, is without merit. *See supra* § I (*Goode* decision requires deference to state evidentiary law; no constitutionally inadmissible evidence in this case).

**15.** Alvord asserts in his brief that Meyers should have called witnesses in order to "hu-

manize" Alvord in the eyes of the jury. The district court did not pass on the issue of whether Meyers' assistance was effective; however, the court indicated that it was prepared to find the assistance ineffective. We also do not pass on this issue; however, we note that the failure to attempt to "humanize" Alvord may well have been the most reasonable choice under the circumstances. It is not good trial tactics to attempt to persuade a jury of the verity of a proposition when it is manifestly impossible to do so. Alvord had committed three violent murders and had an extensive history of past criminal activity. He was not, to say the least, the boy next door who had never before shown a propensity to commit a crime. Meyers reasonably chose to rely primarily on the statutory mitigating circumstance that Alvord could not conform his conduct to the requirements of the law and argue to the jury that incarcerating Alvord would be sufficient specially to deter him from committing future crimes.

ly held that Alvord must prove prejudice to obtain the writ.

## III. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

■ Alvord next contends that his appellate counsel rendered ineffective assistance. He sets forth five issues that his appellate counsel did not raise—issues that, according to Alvord, would have persuaded the Florida Supreme Court to overturn his conviction. Although we address claims of ineffective assistance of counsel on appeal much less frequently than claims of ineffective assistance at trial, it is well established that a defendant has the right to effective counsel on appeal. *See Anders v. California,* 386 U.S. 738, 741–42, 744, 87 S.Ct. 1396, 1398–99, 1400, 18 L.Ed.2d 493 (1966) (counsel must function as advocate on behalf of client). In order to prevail, Alvord must prove that he did not receive " 'reasonably effective representation,' " *Mylar v. Alabama,* 671 F.2d 1299, 1300 (11th Cir. 1982) (citing previous cases), *cert. denied,* —— U.S. ——, 103 S.Ct. 3570, 77 L.Ed.2d 1411 (1983); however, counsel need not provide perfect assistance, *id.* From the reported cases, it appears that counsel's failure to file a brief is in most cases ineffective, *see Anders; Mylar;* however, counsel's failure to advance errors on appeal later gaining "judicial recognition" does not constitute unconstitutional aid, *Sullivan v. Wainwright,* 695 F.2d 1306, 1309 (11th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 290, 78 L.Ed.2d 266 (1983), and counsel need not brief issues reasonably considered to be without merit, *Mendiola v. Estelle,* 635 F.2d 487, 491 (5th Cir. Unit A 1981); *Hooks v. Roberts,* 480 F.2d 1196, 1197–98 (5th Cir. 1973), *cert. denied,* 414 U.S. 1163, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974). Alvord contends that the issues not raised by his counsel were of substantial merit. As we stated in *Hooks,* the best way to evaluate "this question . . . is to examine the alleged trial errors to see if they contain sufficient merit . . . that his appellate counsel can be faulted for not having raised them." 480 F.2d at 1197.

### A. *Failure of Trial Judge* Sua Sponte *to Give Insanity Instruction.*

Alvord argues that his appellate counsel should have asserted as error the failure of the trial judge *sua sponte* to charge the jury that, because of his prior judgment of not guilty by reason of insanity, he was presumed insane until proven sane. We find ourselves in a rather unusual posture in this case. On the one hand, the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension, *see Hooks,* 480 F.2d at 1197, and, as a mixed question of fact and law, the presumption of correctness under 28 U.S.C. § 2254(d) does not apply to this type of claim, *see, e.g., Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980). On the other hand, the validity of the claim that Alvord's appellate counsel failed to assert is clearly a question of state law, and we must defer to the state's construction of its own law. *Wainwright v. Goode,* —— U.S. ——, ——— ——, 104 S.Ct. 378, 382, 78 L.Ed.2d 187 (1983). In this instance, Alvord raised the present claim before the Florida courts on collateral attack of his conviction; and, in *Alvord v. State,* 396 So.2d 184, 191 (Fla.1981), the Florida Supreme Court expressly rejected it as without merit.

■ Although a bewildering mixture of issues both subject to and not subject to a presumption of correctness face us in this case, we believe the proper method of analysis is to accord deference to the Florida Supreme Court's decision to the extent it decides the validity of Alvord's underlying state law claims while reserving for *de novo* consideration the ultimate issue of whether Alvord received constitutionally effective assistance. Following this analysis, it is clear from *Alvord v. State* that the Florida Court held that, as a matter of state law, the trial judge need not have instructed the jury *sua sponte* on the presumption of insanity. Quoting the trial court, the Florida Supreme Court stated:

This ground for post conviction relief is also without merit. No proof of the Defendant's prior adjudication of insanity had ever been submitted to the Court and no such defense was raised. A Defendant has the burden of establishing a plea of insanity by showing that he was legally insane when he committed the criminal act. *Hixon v. State,* (D.C.A.1964) 165 So.2d, 436. The trial court is only required to instruct the jury on issues properly raised. Since the Defense did not choose to assert the defense of insanity, it would have been improper for the trial Court to have instructed the jury on that issue.

396 So.2d at 190–91. It thus seems clear that the trial judge, as a matter of state law, need not have given an instruction that was never requested.[16] Indeed, this conclusion is the only reasonable one under the circumstances—with or without the Florida Supreme Court's decision to aid us. Given the invalidity of the claim that Alvord contends should have been asserted, we conclude that, under *Hooks* and *Mendiola,* Alvord has failed to demonstrate with respect to this issue that his counsel rendered ineffective assistance.

B. *Failure of Trial Court to Grant Alvord's Pro Se Motion to Remove Public Defender as Counsel.*

At trial, Alvord requested the Judge to remove his appointed counsel, Mr. Meyers, because he did not trust Meyers to represent him. The trial judge indicated that he would consider the motion and instructed Meyers to file a formal, written motion should Alvord so desire. The trial judge did not remove Meyers from the case, however; and Alvord now contends that his appellate counsel should have asserted that the trial judge erred by not appointing a different counsel. Noting that the state collateral review court found as a matter of historical

fact that Alvord "ultimately consented to being represented by ... Meyers," the district court held that finding to be fairly supported by the record, *see* 28 U.S.C. § 2254(d), and concluded that reasonable counsel could have decided not to raise the issue on appeal, citing *United States v. Young,* 482 F.2d 993 (5th Cir.1973).

Alvord first argues that the district court erroneously treated the state court's finding on the consent issue as a question of historical fact instead of a mixed question of law and fact, which is afforded no presumption of correctness under section 2254. Alvord cites only *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), as support for this contention. We do not find *Cuyler* controlling here. In *Cuyler* the Court held that whether an attorney represented more than one defendant at trial is a mixed question and not entitled to a presumption of correctness. *Id.* at 341–42, 100 S.Ct. at 1714–15. Whether Alvord decided to accept Meyers as his counsel is clearly a question of historical fact. *See Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). Unlike the issue in *Cuyler,* the inquiry here does not go directly to the effectiveness of the defendant's counsel or the prejudice caused by the representation afforded by the state. Thus, the district court properly afforded deference to the state court's finding on this issue.[17]

 We must, of course, decide without employing a presumption of correctness whether Alvord's appellate counsel was ineffective in failing to raise the present issue. The finding that Alvord accepted his trial counsel certainly supports his appellate counsel's decision not to raise the point. In addition, the record demonstrates that the trial judge had every reason to believe that Meyers and Alvord had resolved their differences from Meyers' statements to that

---

16. We realize that the state court's assumption that Meyers never submitted the prior adjudication of insanity at trial has now been demonstrated to be erroneous. *See supra* note 10 and accompanying text. This does not alter our conclusion that the ground not asserted on appeal lacked merit. Meyers did not plead insani-

ty at trial; and it seems clear from the state court's opinion that the judge need not instruct on an issue not raised.

17. Alvord does not contend that he did not receive a full and fair hearing.

effect at the trial. *See Brown v. Wainwright,* 665 F.2d 607, 612 (5th Cir.1982) (en banc) (trial judge may accept counsel's statements and need not interrogate defendant independently). Given these underlying facts, we conclude that Alvord's counsel acted reasonably by not raising this claim on appeal.

### C. *Examination of Alvord by Dr. Robey.*

■ As we have related above during our discussion of the events leading up to Alvord's trial, *see supra* § II, Dr. Robey examined Alvord, at the request of the trial judge, to determine his competency to stand trial. During the sentencing hearing, Dr. Robey testified for the state; although he based his testimony in part on his previous knowledge of Alvord, he also relied on the pretrial interviews. Alvord contends that the trial judge should not have allowed Robey to testify at the sentencing hearing under the rule stated in *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). The issue before us is whether his counsel's failure to raise this issue on appeal constituted ineffective assistance.

The issue is not without difficulty. The predecessor to this court, in an opinion binding on us,[18] held that *Estelle v. Smith* applies retroactively. *See Battie v. Estelle,* 655 F.2d 692, 696–99 (5th Cir.1981). Nevertheless, the present fifth circuit apparently has held (in a non-binding opinion) that failure of counsel to anticipate *Estelle v. Smith* and timely enter an objection does not constitute ineffective assistance of counsel. *See Gray v. Lucas,* 677 F.2d 1086, 1096 n. 9 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 3099, 77 L.Ed.2d 1357 (1983). This holding is in accord with the rule stated in *Sullivan v. Wainwright,* 695 F.2d 1306, 1309 (11th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 290, 78 L.Ed.2d 266 (1983), that counsel need not anticipate new developments in the law.

We need not rely only on the principle stated in *Sullivan,* however. As the district judge aptly noted:

Several aspects of this case also indicate that Mr. Seymour cannot be faulted for not raising a *Smith* point on appeal. First, trial counsel failed to object to Dr. Robey's arguably *Smith*-violative testimony that petitioner would be dangerous to women in the future and that he was sane at the time of the Florida crimes. Trial Rec. at 1171–72, 1178–79. Second, and more fundamentally, the *Smith* issue would not necessarily have succeeded on appeal. In *Smith* the psychiatrist who examined the accused, Dr. Grigson, testified on the basis of that examination alone. Thus, there was no question that his conclusions on future dangerousness were based on statements made during a custodial examination without prior *Miranda* warnings or notice to counsel. Mr. Seymour faced quite a different circumstance: Dr. Robey had supervised Alvord's treatment for years prior to his escape in Michigan, and his contemporaneous examination of Alvord was in two sessions, the latter of which—on the specific question of petitioner's sanity at the time of the offense—was apparently in substantial compliance with the dictates in *Smith.* His testimony was therefore not based entirely, and may not have been based at all, on the first custodial examination. Finally, the record indicates unequivocally that Mr. Meyers was eager for Dr. Robey to examine his client. Meyers Depo. at 31.

564 F.Supp. at 481–482 (footnotes omitted). Given these factors, the rule in *Sullivan,* and the fifth circuit's holding in *Gray,* we conclude that Alvord's appellate counsel rendered reasonably effective assistance even though he failed to raise this issue.

### D. *Testimony by Robey in Violation of Fla.Stat.Ann. §§ 90.242 & 921.141.*

At the sentencing hearing, Robey testified that Alvord had previously committed two misdemeanors in Michigan and that he had committed kidnapping and rape for which he had been found not guilty by reason of insanity. Robey stated that he did not believe Alvord to have been insane

---

**18.** *See Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc).

when he committed the rape and kidnapping, however. Alvord argues that this testimony was not properly admissible under the Florida capital sentencing statute, Fla. Stat. § 921.141, because it does not tend to prove the presence or absence of the specified aggravating and mitigating circumstances. He also contends that it was admitted in violation of the psychiatrist-patient privilege then codified by Fla.Stat. § 90.242. He urges this court to conclude that his counsel's failure to raise these issues on appeal constituted ineffective assistance.

We begin our analysis by noting that Alvord's attorney raised a similar issue on appeal: he contended that Robey's testimony concerning the Michigan felonies was inadmissible under *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). The Florida Supreme Court rejected this claim. *Alvord v. State,* 322 So.2d 533, 539 (Fla.1975). Given the Florida Court's statement in that case that a wide-open rule of admissibility applies at penalty hearings, *id.,* we think it reasonable for Alvord's counsel not to have asserted the grounds now set forth as limiting the admissibility of Robey's testimony. The testimony clearly bears on the presence or absence of prior criminal activity, Fla.Stat. § 921.141(6)(a), and the capacity of Alvord to conform his conduct to the requirements of the law, *id.,* § 921.141(6)(f).

In addition, Alvord's counsel was reasonable in not asserting the psychiatrist-patient privilege. As the district court stated:

The short answer is that the trial court took considerable care to ensure that Dr. Robey testified only to matters surrounding the Michigan crimes of which he had knowledge independent of communications from Alvord. Next, petitioner cites *Parkin v. State,* 238 So.2d 817, 818 (Fla. 1970) as grounding a possible argument on appeal. *Parkin,* decided over a decade

before *Smith,* held that the fifth amendment rights of a criminal defendant who chooses to plead insanity were not violated when she was ordered by the trial court to cooperate with court-appointed psychiatrists. The court limited the use of such testimony: "[A]ny statements obtained from the patient by the doctor are used as evidence of mental condition only, and not as evidence of the factual truth which may be contained in them." *Id.* at 822. The answers to petitioner's contention that Mr. Seymour should have raised *Parkin* are twofold: first the record reflects again the care of the trial judge in limiting Dr. Robey's testimony on the Michigan crimes to facts he knew from sources other than Alvord's statements; and second, Dr. Robey certainly did not come to know of Alvord's criminal record in the course of the custodial examination he made in January 1974, and *Parkin's* limitations therefore would not apply. Thus, the decision not to raise these matters on appeal was a reasonable tactic.

This reasoning well supports the district court's conclusion that Alvord received effective assistance of counsel on appeal.[19]

## IV. ADEQUACY OF PSYCHIATRIC HEARING BEFORE TRIAL

Alvord contends that he did not receive due process of law at his trial because the competency hearings conducted by Dr. Robey, Dr. Gonzales, and Dr. Sprehe were insufficient to allow the trial judge accurately to rule on his competency to stand trial. Alvord relies on *United States v. Taylor,* 437 F.2d 371 (4th Cir.1970), and *Blake v. Zant,* 513 F.Supp. 772 (S.D.Ga. 1981) (appeal docketed 5/13/81), and calls our attention to Judge Sobeloff's opinion in *Taylor* discussing critically the competency examination in that case, *see* 437 F.2d at 379–83. It is now well established that conviction of a legally incompetent defend-

---

**19.** Alvord raises one other issue dealing with his counsel's alleged inadequacies. He contends that his counsel should have argued on appeal that he received an inadequate psychiatric examination. As we conclude in the next section of this opinion, Alvord received a proper examination and hearing. *See infra* § IV. Thus, his counsel cannot be faulted for failing to raise this claim.

ant violates due process. *Pate v. Robinson*, 383 U.S. 375, 386, 86 S.Ct. 836, 842, 15 L.Ed.2d 815 (1966); *Reese v. Wainwright*, 600 F.2d 1085, 1090–94 (5th Cir.), *cert. denied*, 444 U.S. 983, 100 S.Ct. 487, 62 L.Ed.2d 410 (1979). Stated in another way, the state must have held "an adequate hearing on [Alvord's] competency," *Pate*, 383 U.S. at 386, 86 S.Ct. at 842, or we must hold Alvord's conviction invalid. The district court properly refused to invalidate the conviction because an examination of the record shows that the state afforded Alvord an adequate hearing.

We need not repeat here the rather detailed account of the pretrial proceedings related to Alvord's competency set forth above. *See supra* § II. To summarize the events, the trial judge several times ordered two psychiatrists to examine Alvord, but they were unable at first to form an opinion because of Alvord's failure to cooperate. The judge then ordered that Alvord be sent to the state mental hospital for observation, but he rescinded that order because he believed he lacked the necessary authority to enter it. In order to obtain a meaningful examination and opinion, the court invited Dr. Robey to come to Florida from Michigan to examine Alvord at state expense. Robey talked twice with Alvord; and, primarily on the basis of Robey's diagnosis, the judge found Alvord competent.

Alvord argues that the examination he received was grossly inadequate because of the poor conditions and lack of time spent together by Robey and Alvord. Robey testified to this effect at the district court's evidentiary hearing. Supp.Appellate Rec. II, 21–24. We find no indication that Robey believed at the time he conducted his examination that he was operating under unacceptable conditions, however. The record shows that Robey submitted the following report to the trial judge:

The above-named 26–11[?] year old white, married Catholic male was interviewed on two separate occasions at the Hillsborough County jail in Tampa, Florida. This evaluation was made at the request of the State Attorney following the defendant's refusal at an earlier date to in any way cooperate with the court-appointed examining psychiatrists, Doctors Arturo G. Gonzales and Daniel J. Sprehe.

The defendant in the present case is charged with three counts of first degree murder. He had previously been acquitted by Reason of Insanity in the State of Michigan, and had been committed at the Ionia State Hospital, Michigan's equivalent of Chattahoochee State Hospital in Florida. He had escaped from this institution on January 24, 1973, and had traveled to Florida. It was while on escape from Ionia State Hospital that he is alleged to have committed the three murders with which he presently stands charged.

The defendant was interviewed on two separate occasions. On the first of these interviews, on January 3, 1974, he was seen from 1:45 to 4:40 p.m. with one ten-minute break for the interviewer to answer a telephone call. Interview time on this date totaled two hours and forty-five minutes. During this initial interview, evaluation was done of the defendant's competency to stand trial, but due to his refusal to discuss any of the details of the acts with which he was charged, no opinion could be rendered on criminal responsibility except one generally based on prior knowledge of the defendant in comparison with the mental state as seen during the interview. On the basis of this interview, an opinion was rendered in Court that the defendant was fully capable of recognizing the nature and object of the proceedings, his own position in those proceedings as defendant, the nature and extent of the charges against him, and the possible penalties, and he was felt to be fully capable, insofar as he wished, to advise and cooperate with counsel in both the preparation and implementation of his defense. The defendant did make a statement both on interview, and subsequent thereto on January 4 before the Court, that he had less than complete faith in his assigned counsel and demonstrated this by comparison with the

lawyer who had been assigned to him in Michigan on the question of his extradition to Florida. This very fact itself was indicative of competency to stand trial.

In regard to the question of criminal responsibility, as indicated above, the defendant initially would not discuss the situation. It was only after being reassured from the Bench by the Judge that any inculpatory statements he might make to the psychiatrist could not be used in the case in chief, that he then expressed willingness to discuss the matter.

On January 4, 1974, the defendant was seen again from 6:45 to 9:00 p.m. on the issue of criminal responsibility. Based on this two and one-quarter hour interview, an opinion is rendered that in reference to the act charged, the defendant was aware of the wrongfulness of his actions. Despite this, paranoid and schizoid features are seen in the underlying basic immature sociopathic personality disorder, and were an A.L.I. Model Penal Code test used in the State of Florida, there could conceivably be some argument that, by reason of mental disease, he lacked substantial capacity to conform his behavior to the requirements of the law.

In summary, an opinion is rendered that the defendant, Gary Alvord, is both competent to stand trial and criminally responsible under Florida law.

At one of the numerous pretrial hearings, Robey made the following statements concerning the adequacy and results of his examinations:

Q. And throughout this interview with and examination of the defendant, Gary Alvord, were you able to form an opinion as to whether or not he would be able to aid and assist his counsel in the preparation and presentation of his defense?

A. Yes, sir, I think, I have some qualifications in this area, but the qualifications are more concerned with the fact that he has been aware of comparisons or has made comparisons between the assistance he obtained from counsel here and the assistance he obtained, for instance, from counsel in Michigan at the time of his extradition. This showed me, of course, that while he might be concerned about the expertise that would be applied legally to his case, that any reluctance to cooperate would be just that. It would not be in any way based on mental illness. It would be based in the hope for the maximum representation he could receive.

Q. Are you saying that he was concerned that he was not going to get full legal protection here as opposed perhaps to the attorney he had in Michigan?

A. That is correct.

Q. Is that what you are saying?

A. Yes.

Q. So, it didn't have anything to do with any mental illness that he might not be able to—

A. No, sir.

Q. —aid and assist his counsel?

A. This, this was based in what I feel was entirely, logical, reasonable concern, particularly in view both of capital punishment being reinstituted in this state and the realization of the severity of the offense with which he is charged. And it indicated to me not that he was incompetent but that his abilities to thoroughly evaluate the legal situation were, as I indicated before, perhaps above average.

Q. Okay. So, as to his ability to aid and assist counsel, there is no, in your opinion, there is no mental illness or disease that would prevent or preclude him from aiding and assisting his counsel?

A. That is correct.

Q. Okay. Now, was he able to understand the charges pending against him in this case, three counts of murder in the first degree?

A. Yes.

Q. And that is your opinion regarding that?

A. That's correct.

Q. Okay, No qualifications regarding it?

A. No, sir.

Q. As to his understanding of the charges?

A. All of these are within the bounds of reasonable medical certainty.

Q. Okay, Doctor, your opinion at this point would be that Gary Alvord is competent to stand trial?

A. That's correct.

Q. Okay. Thank you.

In response to questions by Meyers on cross-examination, Robey stated:

Q. Were you able to adequately make a determination on January the 18, 1973?

A. Of what, Mr. Meyers?

Q. Of his mental condition?

A. Oh, yes, sir. I think once you have obtained an adequate past history and get to know someone well, as little a period of time as thirty seconds to a minute can give us more than adequate diagnostic information, again based on the fact that you already know the defendant, the patient, well.

\* \* \* \* \* \*

A. Well, Mr. Meyers, I think I could give you many examples, both actual and certainly hypothetical ones that might be of greater assistance to the Court, where psychiatric diagnoses can be made in as little as five to ten seconds, if the symptoms are sufficiently overt. But as I indicated previously in my testimony, when you get to know someone quite well, as I had Gary, a very few minutes will suffice. I am quite sure you yourself can go home at night and perhaps within five seconds know whether you wife is feeling happy, sad or—

Q. I won't argue with you.

Robey also testified that he was the doctor most familiar with Alvord:

Q. So, it's your opinion you know more about him than anybody else who was there?

A. That's correct.

The state trial court also based its findings on the report of Dr. Sprehe, who, after repeated attempts to examine Alvord, reached the following qualified conclusions:

Pursuant to your order I again tried to perform a psychiatric examination on Gary Eldon Alvord on 1/8/74. As you know, I tried to interview him on 10/9/73 but at that time he had refused to talk to me, stating that if I was a doctor he didn't want to talk to me even though I tried to explain my position at that time regarding being assigned by the court, etc. to talk to him. He stated that he was aware of his rights and that he didn't need to talk to anybody and therefore I was unable to perform a psychiatric examination.

Since that time I talked to Dr. Ames Robey who was his doctor in Michigan when he was in the State Hospital there and Dr. Robey stated that he thought he had persuaded Mr. Alvord to be willing to talk to me but he wasn't sure, but at any rate that Mr. Alvord certainly understood his legal rights and his legal position and was certainly able to stand trial. This was the opinion of Dr. Robey.

Armed with this information, I again went to talk to Mr. Alvord on 1/8/74 and he again in a very friendly way refused to talk with me. He denied talking with Dr. Robey and stated that he had just fired his attorney and that he couldn't talk with me without an attorney present and that he had no wish to talk to me anyway and that he knows his rights and that his rights are that he must have an attorney present if he wants one whenever he is being interviewed by anyone. I tried to explain my neutral position and the fact that I am only appointed as an expert witness to examine him but he was unwilling to listen to my explanation and finally walked out of the interview room without further examination being conducted.

It is my definite impression that Mr. Alvord is mentally competent to stand trial and that he is able to understand the nature of the charges against him and that he is able to assist counsel in the preparation of his defense; however, this impression is offered on the basis of my brief meeting with him plus my conversation with his old psychiatrist, Dr. Ames Robey.

It appears from these record excerpts that Alvord received a constitutionally adequate examination. We are not prepared to hold, as Alvord requests, that the state must commit all defendants to the state mental hospital for observation if they so request. We also are not prepared to invalidate Alvord's conviction because Robey, years after his pretrial examination, has expressed limited qualifications as to his conclusions.[20]

## IV. *MIRANDA* VIOLATIONS

At trial, the police officer who arrested Alvord in Michigan testified over an objection that, when arrested, Alvord stated, "I'm a rapist, not a ... thief." Alvord contends that the trial court should have excluded this testimony under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16

L.Ed.2d 694 (1966), because: (1) the officer did not advise Alvord of his right to have appointed counsel; (2) Alvord never signed a written waiver of his rights; and (3) Alvord's statement was involuntary because he lacked the capacity to understand what he was saying, *see Blackburn v. Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). The district court properly rejected these arguments.

In *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), the Supreme Court addressed the effect of a warning faulty for the identical reason at issue here—failure to include notice of right to appointed counsel—and held that the omission did not render the statements inadmissible. The Florida Supreme Court affirmed Alvord's conviction on the basis of

---

**20.** Robey stated at the district court's hearing:

Q. Could you please describe to me the physical surroundings that you conducted your examination in?

A. Well, initially, we just stood in the hall. There was no place to talk and during this period, there was really little could be done.

After about ten or fifteen minutes, a bail bond cubbyhole became available. We used that for maybe another half hour or so and then finally one of the guards informed us that a room was available and we stayed in that until eight—until 4:15.

Q. Based on your medical qualifications in applying good psychiatric practice, do you have an opinion as to the adequacy of that physical layout when conducting a psychiatric exam to determine competency to stand trial in a triple murder case?

A. Well, I think when you add the caveat that involve a triple murder case, I would have to state that they are not only bad, they were totally unacceptable, although all that was available.

Q. Applying good psychiatric practice, do you have an opinion as to the adequacy of that particular room to conduct an examination to determine competency to stand trial and sanity at the time of the offense in a triple murder case?

A. I have such an opinion.

Q. What is that opinion?

A. It is my opinion that, given the seriousness of the charges and given the potential for the death penalty, the facilities were totally inadequate and that there should have been hospitalization.

Q. Now, are you able to tell us whether or not you could have reached an opinion as a result of your examination on January 3 and

January 4, but for the fact that you have available to you access to Gary Alvord's medical records?

A. Yes, sir. I feel that without my prior knowledge of him, I could not have reached an opinion certainly in regard to criminal responsibility. In regard to competency, the major concern I had is that he might show this so-called hyper-competency syndrome of the paranoid individual who knows all the law. He doesn't really know how accurate it is, but he knows it all and is very upset about what is going on.

Had I been able to talk to Mr. Meyers, either during or subsequent to my initial evaluation and go back and make another, I suspect I would have been less sure of his competency, but I had more data than anyone else and it made it easier for me, but the situation even on competency was hardly adequate.

\* \* \* \* \* \*

It is my opinion that while I personally don't hold any great grief for or against the death penalty, it is somehow terribly permanent and I feel it is extremely important in such cases to not only have at least three psychiatrists, but to have the opportunity made available for them to get every last bit of significant data concerning the patient's whole life history and really, without a hospital setting which will also provide day to day observations, you simply can't do this in a jail setting.

Robey's testimony at the pretrial hearing demonstrates that he entertained no similar reservations then. The state need not anticipate such reservations, not raised at trial, first voiced when the execution of the death sentence becomes imminent.

*Michigan v. Tucker, see Alvord v. State,* 322 So.2d 533, 537 (Fla.1975); we agree with the Florida Court that this case and *Tucker* are indistinguishable. It is also clear that the failure of the officer to obtain a written waiver does not render the statement inadmissible. *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

■ Finally, we do not find Alvord's reliance on *Blackburn v. Alabama* persuasive. In that case the defendant was arrested and interrogated; shortly after the interrogation he was adjudicated insane. Four years later he was found competent to stand trial and his confession was admitted against him. 361 U.S. at 200–02, 80 S.Ct. at 276–77. The Supreme Court held that (despite the trial court's finding that the confession was voluntary) the confession should not have been admitted in light of substantial evidence that the defendant was incompetent when he confessed. *Id.* at 203–05, 80 S.Ct. at 278–79. We face here a different situation. The trial judge had before him substantial evidence of Alvord's competency (and of the voluntary nature of the confession). Under 28 U.S.C. § 2254(d), we must afford the finding of competency a presumption of correctness; and, in this case, nothing appears that upsets this presumption. *See generally Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

## VI. UNCONSTITUTIONAL RESTRICTION OF JURY'S CONSIDERATION OF MITIGATING CIRCUMSTANCES

■ In *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court held that the "sentencer [must] not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604, 98 S.Ct. at

2964 (emphasis in original). Alvord contends that the jury instructions at the sentencing hearing violated the *Lockett* rule by limiting the jury to considering only statutory mitigating circumstances. *See Washington v. Watkins,* 655 F.2d 1346, 1377 (5th Cir. Unit A 1981) (invalidating sentence on basis of faulty instructions), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982). The district court correctly analyzed and resolved this issue.

The judge instructed the jury in this case that the "aggravating circumstances which you may consider are limited to such of the following as may be established by the evidence ..." and then listed the statutory aggravating circumstances. The judge then instructed the jury that the "mitigating circumstances which you may consider if established by the evidence are these ..." and then listed the statutory mitigating circumstances. In *Ford v. Strickland,* 696 F.2d 804 (11th Cir.1983) (en banc),

> Instructing the jury on aggravating circumstances, the trial judge stated, "[y]ou shall consider only the following ...," and read the statutory language. With regard to mitigating circumstances, he said, "[y]ou shall consider the following ...," omitting the word "only" and again reading the appropriate statutory language.

*Id.* at 811–12. We see no distinction of importance between the language used in *Ford* and that used in the present case. In neither situation did the trial judge commit the error present in *Washington v. Watkins,* in which the charge "operated affirmatively to preclude jury consideration of nonstatutory mitigating factors." 655 F.2d at 1377 (footnote omitted). Also, in both this case and *Ford* the judge permitted the defendant freely to introduce evidence without regard to its statutory relevance.[21] Thus, the sentence is not invalid under *Lockett.*

---

**21.** For example, the judge allowed Robey to testify that Alvord could be rehabilitated. Meyers relied heavily in this case on the statutory mitigating factor that Alvord was unable to conform to the requirements of the law as

well as the extreme mental disturbance factor. Given the thrust of Meyers' defense, testimony establishing nonstatutory mitigating evidence was of limited value in any event. *See supra* note 15.

## VII. PROPORTIONALITY REVIEW

Alvord's final claim is that the Florida Supreme Court failed to conduct an adequate proportionality review in this case because the "Court's comparison makes absolutely no reference to the characteristics of the offender in each prior case, comparing instead, only the facts of the crime .... In addition, [the opinion does not review] *all* cases of a similar nature in imposing the sentence of death." We have read the opinion of the Florida Court and we find the review beyond challenge. The Court stated:

It is our responsibility to review the sentence in the light of the facts presented in the evidence, as well as other decisions, and determine whether or not the punishment is too great. See *State v. Dixon* [283 So.2d 1 (Fla.1973)], *supra.* Three murders were committed while the perpetrator was engaged in the commission of the felony offense of burglary. Each of the murders was especially heinous, atrocious and cruel in that the homicides were committed through strangulation by use of a rope. This could only be accomplished through a cold, calculated design to kill, as distinguished by a single shot from a firearm during an outburst of anger. The great risk of serious bodily harm by death to other persons is apparent, in that defendant obviously murdered two of the victims in order to avoid a surviving witness to the murder of the other victim. The murders were not committed under circumstances which defendant believed to provide a moral justification or extenuation for his conduct and his capacity to conform his conduct to the requirements of law was not impaired. His age, 26 years, had no particular significance. These aggravating circumstances outweigh any circumstances which would mitigate the sentence in this case.

There is no way that the Legislature could program a judicial computer with all of the possible aggravating factors and all of the possible mitigating factors in each case. See *State v. Dixon, supra.* The law does not require that capital punishment be imposed in every conviction in which a particular state of facts occur. The statute properly allows some discretion, but requires that this discretion be reasonable and controlled. No defendant can be sentenced to capital punishment unless the aggravating factors outweigh the mitigating factors. However, this does not mean that in every instance under a set state of facts the defendant must suffer capital punishment.

The statute contemplates that the trial jury, the trial judge and this Court will exercise reasoned judgment as to what factual situations require the imposition of death and which factual situations can be satisfied by life imprisonment in light of the totality of the circumstances present in the evidence. Certain factual situations may warrant the infliction of capital punishment, but, nevertheless, would not prevent either the trial jury, the trial judge, or this Court from exercising reasoned judgment in reducing the sentence to life imprisonment. Such an exercise of mercy on behalf of the defendant in one case does not prevent the imposition of death by capital punishment in the other case.

*Sullivan v. State* [303 So.2d 632 (Fla. 1974)], *supra,* involved a death sentence which was held to be appropriate by this Court. During the course of a robbery defendant abducted the victim, struck him with a tire iron, and shot him with both barrels of a shotgun in the back of the head. The defendant reloaded and discharged both barrels *again* into the victim's head. Just as in *Sullivan,* this case involves the commission of a burglary and the murder of the victim. The deliberate actions of Sullivan in repeatedly shooting the victim is no less heinous and atrocious than the actions of defendant Alvord in deliberately strangling three women with a rope.

*Gardner v. State,* 313 So.2d 675 (Fla. 1975), was an appeal from a death sentence for the murder of a female. The murder was accomplished by the use of a

blunt instrument, the victim's body containing at least 100 bruises, abrasions and contusions. There was a massive hemorrhage of the pubic area. The victim was beaten so badly that the murder was looked upon as being especially heinous, atrocious and cruel. These aggravating circumstances outweighed any mitigating circumstances and the death penalty was upheld. Certainly, the atrocious manner in which Gardner murdered his victim is no more atrocious or heinous than the atrocious manner in which Alvord coldly strangled three females while committing his burglary.

A female victim was involved in *Hallman v. State,* 305 So.2d 180 (Fla.1974). The defendant committed the crime of robbery, cut the victim about the throat and neck with broken glass, slitting her throat and causing her death. Hallman had been convicted of two previous crimes involving an assault upon a young woman with a dangerous weapon. Alvord had been involved with the rape of a young girl in Michigan, and the evidence indicated that an assault was made upon the deceased Lynn, who was 18 years of age. The act of Hallman in cutting the victim with broken glass is no more heinous than the strangulation of three women by Alvord. Comparing the aggravating and mitigating circumstances with those shown in other capital cases and weighing the evidence in the case *sub judice,* our judgment is that death is the proper sentence.

Pursuant to Rule 6.16(b), Florida Appellate Rules, we have reviewed the evidence to determine whether the interest of justice requires a new trial. No reversible error is made to appear and the evidence does not reveal that the ends of justice require that a new trial be awarded. We find that the judgment and sentence of the trial court in this cause is in accordance with the justice of the cause. *Alvord v. State,* 322 So.2d 533, 540–41 (Fla. 1975).

Since the briefs were submitted in this case, the Supreme Court issued its decision in *Pulley v. Harris,* —— U.S. ——, 104 S.Ct. 871, 78 L.Ed.2d —— (1984). In *Pulley,* the Supreme Court held that the Constitution does not require a state to conduct proportionality reviews, provided that its "capital sentencing system [is not] so lacking in other checks on arbitrariness that it would not pass constitutional muster without comparative proportionality review . . . ." *Id.* at ——, 104 S.Ct. at 873. Like the California system, the Florida system requires that "special circumstances," *id.* must be found before the sentence of death may be imposed in a given case. *See generally Barclay v. Florida,* —— U.S. ——, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). The Florida system also contains other checks on the discretion of the sentencing authority so often discussed that we need not repeat them here. *See id.* Thus, in light of *Pulley,* Florida is not required to conduct a proportionality review. Alvord does not contend that he was the victim of an unequally applied proportionality review, and the review he received was as extensive as is given by the State of Florida. Thus, his attack on his death sentence on this ground is without merit.

The opinion of the district court is REVERSED in part and AFFIRMED in part.